UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
|     Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| $52,037.96 seized from account number | : | 3:14-cv-00591-WWE |
| XXXXX3161 at JPMorgan Chase & Co. | : | |
| held in the name of | : | |
| SAND INTERNATIONAL, INC., | : | |
| | : | |
| JPMorgan Chase cashier's check number | : | |
| 9805806932 in the amount of $65,209, | : | |
| | : | |
| One 2014 BMW X5, | : | |
| vin number 5UXKR0C56E0C25750, | : | |
|     Defendants. | : | |

**MEMORANDUM OF DECISION ON CLAIMANT SAND INTERNATIONAL INC.'S MOTION TO DISMISS**

The government brought this civil action *in rem* to enforce the provision of 18 U.S.C. § 981(a)(1)(c) that provides for the forfeiture of proceeds traceable to wire fraud in violation of 18 U.S.C. §1343.

The defendants are: $52,037.96 seized from account number XXXXX3161 at JPMorgan Chase held in the name of Sand International, Inc.; JPMorgan Chase cashier's check number 9805806932 in the amount of $65,209; and one 2014 BMW X5, vin number 5UXKR0C56E0C25750. Claimant Sand International has moved to dismiss the verified complaint. For the following reasons, claimant's motion will be granted.

**BACKGROUND**

The following background is taken from the allegations of the complaint, which are considered to be true for purposes of this ruling.

On October 21, 2013, the New Haven Field Office of the United States Secret Service was contacted by a Special Agent from the Cincinnati, Ohio, Field Office concerning ongoing schemes throughout the United States to purchase high-end vehicles from automobile companies such as Jaguar, Land Rover North America, Mercedes Benz USA, Porsche, and BMW North America.  The object of these schemes is to re-sell these fraudulently obtained high-end automobiles for a profit overseas in places such as China.

As part of these schemes, individuals were recruited and paid nominal sums of money to purchase these high-end luxury automobiles by acting as straw purchasers/owners.  In addition, so as to affirmatively conceal the true identity of the real purchaser of these high-end automobiles, those paid as straw purchasers provided the real purchasers with copies of their valid state drivers' licenses.  In furtherance of the scheme to defraud, the real purchasers would contact car dealerships affirmatively misrepresenting themselves as the straw purchasers.

As part of the scheme to defraud, the real purchasers would provide the car dealerships with a copy of the straw purchaser's driver's license through the use of the wires so that the vehicle could be registered and insured in the straw purchaser's name.  Once a sale in the name of a straw purchaser was effectuated, the real purchaser would arrange to take the straw purchaser to the dealership to deliver a certified bank check to the dealership before taking temporary possession of the high-end automobile.

At no time did the real purchaser ever accompany the straw purchaser into the dealership to take possession of the automobile.  In fact, as part of the scheme to defraud the American car dealerships, the real owner, or agents of the real owner, would meet with the straw purchaser who would immediately surrender the automobile to them.

As making money was the object of the scheme to defraud, the real purchaser, or agents of the real purchaser, would then immediately place the high-end automobile onto a car carrier (so as not to put any mileage on the new vehicle) with the understanding that the vehicle would be shipped overseas and sold for a substantial profit on the gray market, thereby injuring the automobile manufacturers by undercutting their market share overseas.

As part of what the Special Agent from Cincinnati told the USSS New Haven Field Office, on October 21, 2013, an individual named Brian Kerbe had been identified as a straw purchaser ("Straw Purchaser Kerbe") in the District of Connecticut as being part of an on-going scheme to purchase high-end automobiles in the Greater Connecticut area that were being immediately transported overseas.

On October 22, 2013, the New Haven Office contacted Straw Purchaser Kerbe and learned that he was to purchase another vehicle in the manner described above on or about October 30, 2013.  As in the past, Straw Purchaser Kerbe was contacted and paid to act as a straw purchaser by misrepresenting to a car dealership that he was purchasing a high-end automobile for his own use and enjoyment.  Brian Kerbe explained to the USSS that as a paid straw purchaser, he had no contact whatsoever with a car dealership until he was directed to meet other people in the scheme, who presented him with a certified bank check and drove him to a dealership, where Kerbe exchanged the bank check for a vehicle that he had allegedly purchased for his use and enjoyment.  After Kerbe drove the vehicle a short distance from the dealership, he would immediately surrender the car to other people participating in the scheme.

Straw Purchaser Kerbe told the USSS that the individuals buying these high-end vehicles made a copy of his driver's license and used it to purchase vehicles in his name, rather than their

own. Kerbe was told by the people employing him that at least some of these cars being purchased in his name were going to be shipped overseas, but Kerbe was assured that this practice was legal. For the purchase of some vehicles, they even had him sign a power of attorney. No power of attorney was executed for the purchase of the BMW X5 on October 30, 2013.

On October 30, 2013, the USSS met with Straw Purchaser Kerbe who explained to them that after each straw purchase, he would surrender the vehicle a short distance from the dealership to individuals responsible for having the vehicle transported out of the country to be sold overseas. When Straw Purchaser Kerbe subsequently received title and registration documentation in his name for the vehicle, he was directed to promptly deliver title to different unidentified individuals acting as his "handlers." Typically, the handlers receiving title and registration documentation from Straw Purchaser Kerbe were different people each time.

Straw Purchaser Kerbe also told the USSS on October 30, 2013, that he had been contacted by an individual involved in the scheme who confirmed with Kerbe that he would be purchasing two vehicles later that day. One vehicle to be purchased was a BMW from a dealership located in North Haven, Connecticut.

On October 30, 2013, law enforcement established surveillance in the area of the Whole Foods parking lot in Danbury where a gray Honda Civic with a New York license plate was observed entering the parking lot and driving to where Straw Purchaser Kerbe was waiting. Straw Purchaser Kerbe entered the Honda that contained a female driver and two male passengers. The Honda was then surveilled traveling from the Whole Foods parking lot to the North Haven BMW dealership. The Honda and its occupants were observed driving away from

the dealership after Straw Purchaser Kerbe exited the vehicle and entered the car dealership to purchase the BMW. Straw Purchaser Kerbe was then observed exiting the dealership driving a 2014 BMW X5.

A short distance down the road, law enforcement observed Straw Purchaser Kerbe transferring possession of the 2014 BMW X5 to the occupants of the Honda.  Law enforcement interrupted the exchange and interviewed all four individuals separately.  Law enforcement learned that Straw Purchaser Kerbe was also in possession of a JPMorgan Chase cashier's check in the amount of $65,209 that was made payable to Orange County BMW for the straw purchase of a second vehicle that day.  The cashier's check was numbered 9805806932 drawn from account number XXXXX1433.  Straw Purchaser Kerbe told law enforcement that when he got into the Honda in Danbury he was provided with the cashier's check that had just been used to purchase the BMW X5 from North Haven BMW and with the cashier's check made payable to Orange County BMW for the second vehicle.

After being advised of her Miranda rights, the female driver of the Honda identified herself and told law enforcement that she had been recruited to drive from New York to Connecticut that morning.  She claimed that this was her first involvement with the other individuals in her car.  A second occupant of the Honda had $4,000 in United States Currency on his person and did not appear to speak English.  Through a Chinese interpreter, it was learned that his name is Ming Lin.  Lin indicated that he did not wish to speak to law enforcement.  His cell phone was subsequently seized as evidence.  It was later determined that he was legally in the United States.

A second male occupant of the Honda was identified as Colin Cheung.  The USSS

5

Cincinnati Field Office had previously identified Cheung as a suspect in a similar scheme to purchase vehicles in the Cincinnati area through straw purchasers for resale overseas. After being advised of his Miranda rights, Cheung agreed to speak with law enforcement. After being brought to the New Haven Field Office, Cheung admitted to being involved in the scheme to purchase vehicles that are later transported overseas.

      Cheung signed an Affidavit, Waiver of Claim and Notice, and Consent to Forfeiture of Personal/Real Property form on which he swore under penalty of perjury that he was the sole owner of the 2014 BMW X5. Cheung also stipulated to probable cause for the forfeiture of the BMW as it represented proceeds of and/or property used to facilitate wire fraud.

      In his sworn, written statement Cheung admitted to being involved in an ongoing scheme to purchase vehicles since August, 2011. Cheung also stated that he currently works for an individual named James Kim, who arranges for the purchases of the vehicles by telephoning dealerships and claiming to be the buyer of the vehicles that are ultimately purchased through straw purchasers. Once Kim arranges for the purchase of a vehicle, Cheung is responsible for meeting the straw purchasers and transporting them to the car dealerships to complete the straw purchase transaction. Cheung estimated that he had picked up about thirty (30) cars since June, 2013.

      Cheung told law enforcement that he was also responsible for transporting the recently purchased vehicles to warehouses located in New Jersey. Cheung said that the checks given to Straw Purchaser Kerbe on October 30, 2013, were provided by the other male occupant of the Honda, Ming Lin. Cheung claims that he had only worked with Lin once before.

      Cheung also confirmed that the JPMorgan Chase cashier's check given to Straw

Purchaser Kerbe on October 30, 2013, was intended to be used to purchase another BMW X5 from BMW of Orange County. Cheung consented to the search of his cell phone which he surrendered to law enforcement.

Later on October 30, 2013, the USSS Special Agents returned to North Haven BMW and met with the general manager, who provided copies of the documentation related to the straw purchase of the 2014 BMW X5 earlier that day, including a copy of the JPMorgan Chase cashier's check used to purchase the BMW, check number 9805806932. On October 31, 2013, law enforcement learned that the cashier's check provided by North Haven BMW for the purchase of the 2014 BMW X5 was funded from JPMorgan Chase bank account number XXXXX3161 in the name of Sand International, Inc.

On November 1, 2013, law enforcement applied for, received, and executed a federal seizure warrant for $52,037.96 from Account Number XXXXX3161 at JPMorgan Chase held in the name of Sand International, Inc.

On November 22, 2013, law enforcement applied for and received a federal seizure warrant for JPMorgan Chase Cashier's Check Number 9805806932 in the amount of $65,209 for the straw purchase of a BMW at Orange County BMW in New Jersey on October 30, 2013. The seizure warrant was executed on November 25, 2013.

**The Use of Wires in Furtherance of the Scheme**

On January 8, 2015, as part of this ongoing investigation, Todd Orowson, a former client advisor for BMW of North Haven, told the USSS that he had received a sales call from someone claiming to be Brian Kerbe in October, 2013. Over the telephone, the individual claiming to be Brian Kerbe told Orowson that he wanted to purchase an X5 BMW as soon as possible for no

7

more than $63,000. As part of the sale, the individual claiming to be Brian Kerbe provided a credit card number over the telephone to secure the $1,000 down payment. Orowson then told the individual claiming to be Brian Kerbe that the dealership needed a copy of Kerbe's driver's license and proof of insurance emailed to him prior to delivering the vehicle to the individual claiming to be Kerbe. This information was provided to the dealership as requested by Orowson.

Orowson also told the USSS that the individual claiming to be Kerbe emailed a copy of the real Brian Kerbe's driver's license to him at the dealership. After unsuccessfully trying to reach the person Orowson believed to be Brian Kerbe to arrange a delivery date, the individual claiming to be Kerbe contacted BMW of North Haven Client Advisor Todd Orowson and set the date of October 30, 2013, to complete the transaction.

On October 30, 2013, Straw Purchaser Kerbe appeared at BMW of North Haven with a certified bank check for approximately $65,000 which was used to complete the sale of the BMW X5. Straw Purchaser Kerbe attempted to surrender the BMW X5 to Cheung and Lin a short time later, at which time the USSS interceded.

**BMW of North Haven is a Victim of the Scheme to Defraud**

Steven Zaletta, General Manager of BMW of North Haven ("Zaletta"), told the USSS that the dealership would not have knowingly sold the 2014 BMW X5 to Straw Purchaser Kerbe had they known that the vehicle was going to be shipped overseas to be re-sold.

Zaletta explained to the USSS that if a BMW dealership knowingly sells an automobile to those attempting to ship vehicles overseas, BMW of North America ("BMWNA") can impose substantial financial penalties against the dealership that far exceed any profits received from the prohibitive sale.

Zaletta said that one of the financial penalties that BMWNA could impose against a dealership is the revocation of the "value added bonus" incentive offered by BMWNA to its dealerships which represents five percent (5%) of the cost of the vehicle sold to those intending to ship it overseas for resale. A dealership found to have been involved in one of these prohibited sales could potentially be suspended prospectively in the "value added" program resulting in a significant financial loss to the dealership.

Zaletta told the USSS that if BMW of North Haven was suspended from further participation in the "value added" program, the dealership would lose approximately $100,000 per month.

**BMW North America is a Victim of the Scheme to Defraud**

As a result of the growing problem of BMW automobiles being shipped to China from the United States and the Middle East, producing economic harm and the high potential for a price collapse, as well as jeopardizing profitability for BMW dealerships in China, the BMW Group (BMWNA is part of BMW Group) retained Frederick A. Raffa, Ph.D. Raffa was tasked with analyzing and assessing the adverse financial impact to BMW Group as a result of schemes to defraud such as the one that forms the basis of this amended complaint.

The diversion of BMW automobiles from the United States market to the Chinese market lessens the demand for BMWs manufactured in the United States by the BMW Group to be sold in the Chinese market. Expenditures by the BMW Group incurred for the purpose of counteracting the economic impact of the export schemes (such as the one that forms the basis of this amended complaint) constitutes a tangible economic loss to BMW Group.

In calendar 2012 alone, the "cost of retail" incurred by the BMW Group to sell BMW X5

and X6 automobiles in the Chinese market place was increased by at least $212,000,000 as a direct response to the downward economic pressure imposed by a growing number of fraudulent schemes devised to export BMW automobiles from the United States and the Middle East to China (identical to the scheme to defraud that forms the basis of this amended complaint).

## DISCUSSION

Claimant Sand International has filed a motion to dismiss the verified complaint, arguing that (1) the amended complaint fails to meet federal pleading standards; (2) the government fails to plead actual fraud; (3) the government fails to allege a victim or loss; and (4) the funds in the JPMorgan Chase bank account are not forfeitable.

Pursuant to Federal Rules of Civil Procedure Supplemental Rule G, which governs pretrial procedures in forfeiture *in rem* actions, the government's complaint must state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial.  The burden of proof is on the government to establish by a preponderance of the evidence that the property is subject to forfeiture.  18 U.S.C. § 983(c)(1).

Here, the government asserts that the property is subject to forfeiture because it constitutes proceeds traceable to wire fraud in violation of 18 U.S.C. § 1343.  "The essential elements of a mail or wire fraud violation are (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme."  U.S. v. Shellef, 507 F.3d 82, 107 (2d Cir. 2007).

> Our cases have drawn a fine line between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid-which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud statutes.

> In *United States v. Regent Office Supply Co.*, 421 F.2d 1174 (2d Cir.1970), the defendants sold stationery. The defendants' scheme consisted of directing their sales personnel to misrepresent their identities to prospective customers so that the customers would be willing to entertain their offers. . . . (noting, as an example, that the sales personnel fraudulently claimed that they had been referred by a friend of the customer or an officer of the customer's firm). We concluded that no conviction under the mail fraud statute could stand where the misrepresentation was not directed to the quality, adequacy or price of goods to be sold, or otherwise to the nature of the bargain.

Shellef, 507 F.3d at 108.

> **Honest Services Theory of Fraud**
>
> Unlike fraud in which the victim's loss of money or property supplied the defendant's gain, with one the mirror image of the other, see, e.g., United States v. Starr, 816 F.2d 94, 101 (C.A.2 1987), the honest-services theory targeted corruption that lacked similar symmetry. While the offender profited, the betrayed party suffered no deprivation of money or property; instead, a third party, who had not been deceived, provided the enrichment. For example, if a city mayor (the offender) accepted a bribe from a third party in exchange for awarding that party a city contract, yet the contract terms were the same as any that could have been negotiated at arm's length, the city (the betrayed party) would suffer no tangible loss. Cf. McNally, 483 U.S., at 360, 107 S.Ct. 2875. Even if the scheme occasioned a money or property gain for the betrayed party, courts reasoned, actionable harm lay in the denial of that party's right to the offender's "honest services." See, e.g., United States v. Dixon, 536 F.2d 1388, 1400 (C.A.2 1976).

Skilling v. U.S., 561 U.S. 358, 400 (2010).

Here, the sale of the BMW was negotiated at arm's length, and the scheme occasioned a money gain for BMW of North Haven: profit from the sale of the automobile. While the government contends that the dealership is at risk of penalties imposed by BMW of North America, imposition of such penalties by a third party does not change the underlying symmetry analysis, which points to an honest-services theory of fraud. Moreover, the amended complaint alleges that BMW of North America can impose financial penalties against the dealership if the dealership *knowingly* sells an automobile to those attempting to ship vehicles overseas. The

amended complaint alleges that BMW of North Haven would not have sold the BMW if it had known that the vehicle was going to be shipped overseas, so the alleged risk of penalties to BMW of North Haven is avoidable if not illusory.  Based on the allegations of the amended complaint, if BMW of North Haven was actually defrauded, they could not be penalized.  Above all, BMW of North America's decision to penalize dealerships for knowingly selling cars to those attempting to ship vehicles overseas is not relevant to the underlying fraud determination.

In McNally, the Supreme Court held that the mail fraud statute was limited in scope to the protection of property rights and did not extend to schemes to defraud citizens of their intangible rights to honest and impartial government.  McNally v. U.S., 483 U.S. 350, 356-61 (1987).  However, "[t]here is no doubt that Congress intended § 1346 to refer to and incorporate the honest-services doctrine recognized in Court of Appeals' decisions before McNally derailed the intangible-rights theory of fraud."  Skilling, 561 U.S. at 404.

18 U.S.C.A. § 1346 provides: "For the purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."  However, the Supreme Court stated in Skilling that "[t]o preserve the statute without transgressing constitutional limitations, we now hold that § 1346 criminalizes *only* the bribe-and-kickback core of the pre-McNally case law."  Skilling v. U.S., 561 U.S. 358, 408-09 (2010).  Accordingly, outside of bribe-and-kickback cases, the intangible right to honest-services doctrine of mail and wire fraud is dead.  Id.

**Alternative Victims: BMW of North America and BMW Asia**

The government alleges that BMW of North America, though not a party to the transaction at issue, is an additional victim of the scheme to defraud.[1]  Specifically, the amended complaint alleges that "[t]he diversion of BMW automobiles from the United States market to the Chinese market lessens the demand for BMWs manufactured in the United States by the BMW Group to be sold in the Chinese market.  Expenditures by the BMW Group incurred for the purpose of counteracting the economic impact of the export schemes (such as the one that forms the basis of this amended complaint) constitutes a tangible economic loss to BMW Group."  Nevertheless, future market share is not a property right protected by the wire fraud statute.  Accordingly, the government's amended complaint cannot rest on allegations of such damages.

Even before the Supreme Court significantly narrowed the impact of 18 U.S.C. § 1346's protection of intangible rights to honest-services, the Ninth Circuit held that a manufacturer's interest in the disposition of goods it no longer owns is not easily characterized as property and that such an interest cannot support a criminal prosecution under the wire fraud statute.  U.S. v. Bruchhausen, 977 F.2d 464, 468 (9th Cir. 1992).  There, the manufacturer's interest was more compelling because its products were being shipped to the Soviet Bloc. in violation of the Arms Export Control Act and the Export Administration Act.  Id. at 467.  Here, the government does not allege that the export of luxury automobiles violates any export or customs statutes.  The Ninth Circuit reasoned as follows:

---

[1] In its opposition, the government also contends that BMW Asia is a victim, as its efforts to control the market for new cars in China is impaired by the alleged scheme.

13

The manufacturers received the full sale price for their products; they clearly suffered no monetary loss. While they may have been deceived into entering sales that they had the right to refuse, their actual loss was in control over the destination of their products after sale. It is difficult to discern why they had a property right to such post-sale control.

The government argues, however, that the manufacturers lost part of their bargain because they would not have sold the products if they had been told that the products were destined for the Soviet Bloc. Thus, the assurance that the products would be used domestically was, in the government's view, part of the consideration for the sale, and the manufacturers were defrauded of that portion of their bargain.

. . . .

If we are to rely on an analogy, *McNally* provides a closer one than *Carpenter*. In *McNally*, government employees purchasing insurance for the state required the seller to share its commissions with other companies in which the government employees had an interest. There was no showing that the state paid more for its policies than it otherwise would have, or that it received less insurance. The employees were convicted of mail fraud on a theory that their actions defrauded the citizens and government of the state of their right to have the state's affairs conducted honestly. The Supreme Court reversed, holding that, under such a theory, no "property" had been taken by fraud within the meaning of the mail fraud statute, 18 U.S.C. § 1341. The Court noted that "the original impetus behind the mail fraud statute was to protect the people from schemes to deprive them of their money or property." *McNally*, 483 U.S. at 356, 107 S.Ct. at 2880.

. . . .

Our decision is colored by the rule of lenity. As the Court instructed in *McNally*, we may choose the harsher view of the statute only when Congress has spoken in clear and definite language. Id. at 359–60, 107 S.Ct. at 2881–82. Section 1343 provides no guidance, and section 1346 refers only to the intangible right to honest services. 18 U.S.C. §§ 1343, 1346. In the absence of definite language, we must conclude that the manufacturers' interest cannot support a criminal prosecution. *McNally*, 483 U.S. at 359–60, 107 S.Ct. at 2881–82.

Bruchhausen, 977 F.2d at 467-68.

Here, the Court agrees that the manufacturer's interest in controlling future market conditions is not a property right protected by the wire fraud statute. This finding is bolstered by longstanding rules of property law (typically applied to real property) disfavoring restraints on

alienation.

> It is undisputable that "[i]t is the policy of the law not to uphold restrictions upon the free and unrestricted alienation of property unless they serve a legal and useful purpose." Peiter v. Degenring, 136 Conn. 331, 336, 71 A.2d 87 (1949). It is also undisputable that this policy is strong and deeply rooted. J. Dukeminier & J. Krier, Property (3d Ed.1993) p. 223 ("[t]he rule against direct restraints on alienation is an old one, going back to the fifteenth century or perhaps even earlier").

Gangemi v. Zoning Bd. Of Appeals of Town of Fairfield, 255 Conn. 143, 151 (2001).

This conclusion does not leave BMW without protection from such schemes. Agency theory may provide BMW an avenue through which it can rescind sales of the type alleged in the amended complaint:

> One contracting as agent for an undisclosed principal does not, by failing to mention a principal, represent that he is not acting for one. In most instances the existence of a principal is not material, since the agent remains personally responsible. It may be material, however, because the other party does not wish to deal with the principal. Under such circumstances, if the agent, having notice of such facts, represents that he is acting solely on his own account, the other party can rescind. If the agent knows that the other party would not enter into transactions with the principal, his failure to disclose the existence of the principal may be such misleading conduct that a court of equity or a court of law acting with equity powers may grant rescission or other relief. The same results follow if the principal makes the representations or knows of the materiality of the fact not disclosed. A fraudulent principal cannot obtain rights by intentionally employing an innocent agent. Since the contract can be avoided only by the other party, the principal is subject to liability to him at his election.

Restatement (Second) of Agency § 304, Comment a, (1958). BMW may be able to obtain civil remedies based on the type of misleading conduct alleged here; however, the allegations fail to establish that the government will be able to prove by a preponderance of the evidence that the property at issue is subject to forfeiture because a product seller's desire for control over future market conditions is not an interest cognizable as property under the wire fraud statute.

## CONCLUSION

For the foregoing reasons, claimant's motion to dismiss is GRANTED.  The government is instructed to return the seized assets, and the Clerk is instructed to close this case.

Dated this 22nd day of September, 2015, at Bridgeport, Connecticut.

    /s/Warren W. Eginton
WARREN W. EGINTON
SENIOR UNITED STATES DISTRICT JUDGE